OPINION OF THE COURT
Kaye, J.
A claim against a hospital for the negligence of its medical personnel in treating a patient is governed by the Statute of Limitations for medical malpractice, as is a direct cause of action against the doctor and the nurse. However, a claim that the hospital failed to provide competent personnel or to promulgate appropriate emergency room rules sounds in negligence, and is subject to the three-year limitations period (CPLR 214), rather than the shorter medical malpractice limitations period (CPLR 214-a).
I
On October 9, 1980, plaintiff James Bleiler visited the emergency room of Tioga General Hospital in Waverly, New York, seeking treatment for an eye injury he had suffered at work the day before. An unidentified nurse, denominated “Jane Doe” in the complaint, took Bleiler’s medical history, after which he was examined and treated by Dr. Roman Bodnar, an emergency room physician. Bodnar, apparently failing to detect a metal fragment in Bleiler’s right eye, directed him to apply an ointment and wear an eyepatch for three days. If pain and redness persisted, Bleiler was to seek further treatment at the Guthrie *67 Eye Clinic of Robert Packer Hospital in nearby Sayre, Pennslyvania. Bleiler went that very day to the clinic. Surgery was performed on his eye the next day at the Pennslyvania hospital, where he remained until October 20,1980, but sight in his right eye was lost.
The present action against Bodnar, Doe and Tioga Hospital was commenced by Bleiler and his wife on April 11, 1983, two days after expiration of the 21/2-year Statute of Limitations for medical malpractice actions (see, CPLR 214-a). Consequently, Bleiler’s causes of action can survive this motion to dismiss only if they are for negligence, not medical malpractice.[1]
According to the complaint, the emergency room physician, Bodnar, “was negligent in failing to take a proper medical history * * * and in his examination, care and treatment of Mr. Bleiler.” Doe, the emergency room nurse, similarly “was negligent in taking or recording the history of Mr. Bleiler” which was relied upon by Bodnar. Bleiler seeks to hold the hospital liable (a) vicariously for the conduct of Bodnar and Doe, (b) for failure to provide Bleiler with “competent and qualified nurses and emergency room physicians”, (c) for failure to promulgate rules, regulations and procedures regarding the taking of histories from patients and requiring that emergency room patients complaining of eye injuries be seen by eye specialists, and (d) for “being otherwise negligent,” the hospital as an entity having undertaken “to attend to and care for Mr. Bleiler.”
Special Term dismissed the complaint, holding that all of Bleiler’s causes of action are governed by the 2y2-year medical malpractice Statute of Limitations. The Appellate Division modified, affirming as time-barred the dismissal of the causes of action against Bodnar and the hospital as vicariously liable for Bodnar’s conduct, but reinstating the remaining causes of action. The Appellate Division granted the hospital leave to appeal to this court, and certified the following question: “Did this court err as a matter of law in reversing so much of Special Term’s order as dismissed the direct causes of action against defendants hospital and nurse as well as the cause of action against defendant hospital for vicarious liability because of the negligence of its employee-nurse?” The causes of action against Bodnar and against the hospital as vicariously liable for Bodnar’s malpractice are beyond the scope of the certified question, and thus no longer in issue.
*68 II
Before the CPLR became effective, actions for malpractice, including medical malpractice, were governed by a two-year Statute of Limitations, along with actions to recover damages for assault, battery, false imprisonment and malicious prosecution {see, Civ Prac Act § 50 [1]). Thereafter, actions for all professional malpractice were subject to a three-year limitations period {see, CPLR 214 [6]). In 1975, however, the Legislature responded to a crisis in the medical profession posed by the withdrawal and threatened withdrawal of insurance companies from the malpractice insurance market in this State. Believing that all residents of the State were at risk and that prompt action was essential to forestall a collapse of medical services in New York {see generally, Lombardi, Medical Malpractice Insurance: A Legislator’s View, at 85-102), the Legislature enacted chapter 109 of the the Laws of 1975, a comprehensive plan amending the Public Health Law, Insurance Law, Workers’ Compensation Law, CPLR, Judiciary Law, Education Law and Business Corporation Law {see, L 1975, ch 109; see also, Memorandum of State Executive Department, 1975 McKinney’s Session Laws of NY, at 1599-1602).
As the Executive Department, in its statement in support of the bill, noted: “[t]he health and welfare of the people of this State are gravely threatened by the inability of health care providers to get malpractice insurance at reasonable rates. Twenty-three major hospitals will have to close their doors on June 1,1975, if no solution is found for the current crisis. Fifty-seven others carried by the same insurer will have to close as the anniversary dates of their policies are reached. Young doctors cannot afford to set up practice here; middle age doctors are leaving the State for this reason; and, older doctors are driven into early retirement. This serious problem — the adequate delivery of health care services — must be solved.” (Memorandum of State Executive Department, 1975 McKinney’s Session Laws of NY, at 1601-1602, supra.) On signing chapter 109 into law, Governor Carey declared that the “purpose of the bill is to deal comprehensively with the critical threat to the health and welfare of the State as a result of the lack of adequate medical malpractice insurance at reasonable rates”, and that a principal goal of the law was “to assure the prompt and fair disposition of medical malpractice claims” (Governor’s Memorandum, 1975 McKinney’s Session Laws of NY, at 1739).
One of the reforms effected by chapter 109 — perceived to be in the interest of the citizenry generally — was the addition of *69 CPLR 214-a, which provides: “An action for medical malpractice must be commenced within two years and six months of the act, omission or failure complained of or last treatment where there is continuous treatment for the same illness, injury or condition which gave rise to the said act, omission or failure”.[2] “Medical malpractice” is not defined.
On this appeal we must decide whether any of the claims before us allege medical malpractice within the meaning of chapter 109. We conclude that Bleiler’s claims for negligent medical care against the hospital directly, against the nurse directly, and against the hospital as vicariously liable for the conduct of the nurse, are for medical malpractice and therefore time-barred. Bleiler’s claims against the hospital for failure to provide competent emergency room personnel and for failure to promulgate proper regulations, however, are for negligence and thus timely. In the ensuing sections, we deal first with the claim against the hospital directly, next with the causes of action involving the nurse, and finally with the negligent administration claims.
Ill
“Medical malpractice” should not be read to exclude hospitals sued for negligent treatment rendered by their medical personnel. When the Legislature in 1975 shortened the Statute of Limitations for medical malpractice claims as a means of addressing a crisis affecting society, it necessarily included hospitals sued for negligent medical treatment by their employees.
Neither the statute itself nor the legislative history explicitly addresses the issue. Bleiler urges, in support of a restricted definition of medical malpractice, that the phrase “medical or hospital malpractice” used in chapter 109 — for example, in adding section 681 (2) to the Insurance Law and amending section 76 (2-a) (1) of the Workers’ Compensation Law (see, L 1975, ch 109, §§ 17, 19) — indicates a legislative intent to distinguish between the two. But the Legislature also defined “medical malpractice insurance,” for purposes of establishing the Medical Malpractice Insurance Association, to mean insurance against both medical and hospital malpractice (id. § 17, adding Insurance Law § 681 [2]), and it included claims against *70 hospitals in the provision for reporting claims for medical malpractice (id. § 2, amdg Insurance Law § 335 [2] [a]). Nor does the statutory definition of the “practice” of medicine resolve the issue. The Legislature defined the practice of medicine, for licensing, as “diagnosing, treating, operating or prescribing for any human disease, pain, injury, deformity or physical condition” (Education Law § 6521). Because under the Education Law only physicians are licensed to practice medicine, it is suggested that only a licensed physician can commit medical malpractice. The argument is not persuasive. The sound public policy of this State may be to license and regulate those wishing to practice medicine as “physicians,” but this does not mean that the hospitals where they practice also cannot, if the physicians are negligent in treating patients, commit medical malpractice.
That the Legislature did not intend one Statute of Limitations to apply to actions directly against a physician and another to actions against a hospital for the same conduct is evident in the genesis and expressed purposes of chapter 109. The perceived threat was not only to physicians but also to health care providers, particularly hospitals, and the Legislature’s comprehensive response cannot be read so restrictively as to exclude them. The hospitals, also threatened by the insurance crisis,[3] participated extensively in the lawmaking process (see, Bill Jacket, L 1975, ch 109; Memorandum of State Executive Department, 1975 McKinney’s Session Laws of NY, at 1599-1602, supra; Lombardi, Medical Malpractice Insurance: A Legislator’s View, at 90, 99, 102,105, supra; see also, Musso v Westfield Mem. Hosp., 64 AD2d 851, appeal dismissed 45 NY2d 834, lv denied 45 NY2d 714). Moreover, we are mindful of the practical consequences of applying one statute to doctors and another to the hospitals in which they practice. Were a hospital to be sued for the malpractice of a physician-employee during the last six months of a three-year Statute of Limitations, it would likely implead its employee, and the legislative reform could thereby be defeated (see, Heinsohn v Putnam Community Hosp., 65 AD2d 767; Macon v Parsons Hosp., 26 AD2d 584).
A hospital can render medical care only through its physicians and medical staff. We reject the notion that the Legislature shortened the Statute of Limitations for physicians but ignored hospitals sued for their negligence. Thus, we conclude *71 that where — as here — a hospital is sued by a patient for negligent medical treatment, such claims are governed by the 2y2-year Statute of Limitations for medical malpractice.
IV
The same considerations lead us to the conclusion that Bleiler’s causes of action involving Doe, the emergency room nurse,[4] also sound in medical malpractice and are governed by the 2V2-year Statute of Limitations.
While courts have in the past held that a nurse could be liable for negligence, but not for malpractice (see, e.g., Wolff v Jamaica Hosp., 11 AD2d 801, 802; Isenstein v Malcomson, 277 App Div 66, 68; Wildey v Kertzman, 44 Misc 2d 258, 260, affd 24 AD2d 519), “the role of the registered nurse has changed, in the last few decades, from that of a passive, servile employee to that of an assertive, decisive health care provider. Today, the professional nurse monitors complex physiological data, operates sophisticated lifesaving equipment, and coordinates the delivery of a myriad of patient services. As a result, the reasonably prudent nurse no longer waits for and blindly follows physicians’ orders” (1 Louisell & Williams, Medical Malpractice, H 16A.01, at 16A-2). Accordingly, in Bamert v Central Gen. Hosp. (53 NY2d 656, affg 77 AD2d 559), we held that “a nurse is legally capable of committing malpractice” (accord, Beardsley v Wyoming County Community Hosp., 79 AD2d 1110; Musso v Westfield Mem. Hosp., 64 AD2d 851, appeal dismissed 45 NY2d 834, lv denied 45 NY2d 714, supra; cf. Nembard v Brookdale Hosp. Med. Center, 115 Misc 2d 46; contra, 1979 Opns Atty Gen 49, 50; Schwartz v Unger, 108 Misc 2d 456). Although Bamert involved a question of submission of a claim to a medical malpractice panel pursuant to section 148-a of the Judiciary Law, the same reasoning is applicable here.
Chapter 109 itself recognized that nurses can commit medical malpractice: added to the Insurance Law when section 214-a was added to the CPLR was a section requiring all insurance companies issuing “professional medical malpractice insurance” to file reports of “all claims for medical malpractice” made against any “physician, nurse, hospital or other person or institution” (Insurance Law § 335 [2] [a]; L 1975, ch 109, § 2).[5]
*72 Obviously, not every negligent act of a nurse would be medical malpractice, but a negligent act or omission by a nurse that constitutes medical treatment or bears a substantial relationship to the rendition of medical treatment by a licensed physician constitutes malpractice. Such a conclusion is warranted here. Doctor Bodnar and Nurse Doe, who assisted him in the emergency room, are both charged with having failed to take a proper medical history — a crucial element of diagnosis and treatment. Bodnar’s alleged failure to elicit all information pertinent to treatment could unquestionably constitute medical malpractice. The conclusion is no different with respect to the emergency room nurse, functioning in that role as an integral part of the process of rendering medical treatment to a patient.
Huntley v State of New York (62 NY2d 134) does not compel a different result. In Huntley, a psychiatric hospital employee failed to satisfy her duty of taking adequate measures to ensure the safety of a patient who had told her of a plan to commit suicide (cf. Zophy v State of New York, 27 AD2d 414,416, affd 22 NY2d 921; Callahan v State of New York, 179 Misc 781, 784-785, affd 266 App Div 1054). This duty — which included an obligation to inform the staff psychiatrist — was independent of the hospital’s obligation to provide proper medical treatment, and therefore constituted common-law negligence, not medical malpractice (62 NY2d, at pp 137-138).
Nurse Doe was one of the professionals who undertook to treat Bleiler at the hospital emergency room. The claim against her for having allegedly failed to render proper medical care to plaintiff is thus subject to the 2V2-year Statute of Limitations applicable to medical malpractice actions, and time-barred. The cause of action against the hospital for her alleged misconduct, being wholly derivative, is precluded as well (cf. Ruane v Niagara Falls Mem. Med. Center, 60 NY2d 908, 909; City of Buffalo v Maggio, 21 NY2d 1017, 1018).
V
We next consider Bleiler’s claims against the hospital for improper or inadequate hiring practices and administrative procedures.
*73 Bleiler alleges that the hospital was “negligent in failing to provide Mr. Bleiler with competent and qualified nurses and emergency room physicians; in failing to promulgate rules, regulations and procedures requiring nurses and doctors to take adequate and proper histories from patients; in failing to promulgate rules requiring that emergency room patients suffering from eye injuries be seen by eye specialists and in being otherwise negligent.” While no factual specificity is set forth to support these conclusory assertions, since this motion to dismiss is based solely on the Statute of Limitations we reach neither the sufficiency of the pleading nor the merit of the causes of action.
A hospital in a general sense is always furnishing medical care to patients, but clearly not every act of negligence toward a patient would be medical malpractice. Where a claim for breach of duty to use due care in the selection of doctors and nurses, and to furnish competent medical personnel, has been recognized (see, Bryant v Presbyterian Hosp., 304 NY 538, 541-542; 1 Louisell & Williams, Medical Malpractice, 1116.08 [1], at 16-38; 1Í 16.09 [2]), the requisite elements have been markedly different from a malpractice cause of action. For example, plaintiff would have to establish that the hospital failed to use due care in selecting and furnishing personnel — that is, that it failed to make an “ ‘appropriate investigation of the character and capacity of the agencies of service’ ” (Lewis v Columbus Hosp., 1 AD2d 444, 447) — and that such failure was a proximate cause of his injury. Such a claim of negligence would be governed by the three-year Statute of Limitations (see, Gautieri v New Rochelle Hosp. Assn., 4 AD2d 874, affd mem 5 NY2d 952; Van Slyke v Columbia Mem. Hosp., 118 Misc 2d 203, 204-205).
Similarly, a hospital’s failure to adopt and prescribe proper procedures and regulations has given rise to a cause of action (see, Topel v Long Is. Jewish Med. Center, 55 NY2d 682, 684; Fatuck v Hillside Hosp., 45 AD2d 708, affd 36 NY2d 736), the elements of which differ from medical malpractice. Here too — like a cause of action for negligent maintenance of a sidewalk (Cole v City of Albany, 80 AD2d 656) or failure to provide a functioning wheelchair to a patient (McCormack v Mount Sanai Hosp., 85 AD2d 596, 597) — the cause of action would be subject to a three-year Statute of Limitations. In both instances, the gravamen of the complaint is not negligence in furnishing medical treatment to a patient, but the hospital’s failure in fulfilling a different duty.
*74 VI
In sum, Bleiler’s causes of action against the hospital and the nurse for negligent medical treatment are governed by the 2Vz-year medical malpractice Statute of Limitations, and thus time-barred. Only the claims that the hospital failed to provide competent medical personnel and to promulgate and enforce appropriate regulations and procedures, which claims sound in negligence, are timely. The order of the Appellate Division should therefore be modified in accordance with this opinion, and as so modified, affirmed, with costs to appellant, and the question certified should be answered in the affirmative.
Chief Judge Wachtler and Judges Jasen, Meyer, Simons and Alexander concur.
Order modified, etc.

. Bleiler’s contention that the continuous treatment doctrine applied because of the instruction to seek further treatment at the eye clinic was rejected by Special Term and affirmed by the Appellate Division, and is not involved in this appeal.

. As the Report of the Special Advisory Panel on Medical Malpractice observes: “Testimony given by trial attorneys also indicates that there is little likelihood that the reduction in the statute of limitations is going to result in fewer claims. Its major result is likely to be that claims will be brought somewhat sooner than they would otherwise.” (Report of the Special Advisory Panel on Medical Malpractice, at 36-37 [Jan. 1976].)

. In a Report issued in January 1976 by the Special Advisory Panel on Medical Malpractice, the Panel found that the hospitals were experiencing raging insurance costs and difficulty in securing insurance renewals — the same concerns that led to chapter 109. (Report of Special Advisory Panel on Medical Malpractice, at 17-18.)

. According to the hospital, Doe was a “triage nurse” working in the emergency room, who screened patients in order to establish the nature and severity of the condition, so as to place patients in line for treatment.

. See also, Report of the Special Advisory Panel on Medical Malpractice, at 1 (Jan. 1976), which states that one of the purposes of the “tort law/liability insurance system [is to] protect the assets of physicians, hospitals and other *72 health care providers.” While the recodified Insurance Law (L 1984, ch 367) does not contain the cited reference to claims of malpractice against hospitals and nurses formerly in section 335 (which purportedly was combined with former section 335-a to form new section 315), the expressed legislative intent was simply to recodify the Insurance Law without any substantive change (Insurance Law § 102, L 1984, ch 367).